**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**CLARENCE MCCALLUM,**

       **Petitioner,**

**v.**                                    **Civil Action No.  1:04cv142**
                                                       **(Judge Keeley)**

**EDWARD F. REILLY, JR.,
CRANSTON MITCHELL, JOHN
SIMPSON AND BRIAN BLEDSOE,**

       **Respondents.**


## OPINION/REPORT AND RECOMMENDATION

### I.

### Procedural History

      This case was initiated on June 29, 2004, by the filing of a Petition for Writ of Habeas Corpus by a Person in Custody in the Northern District of West Virginia.  At issue in the petition is a decision of the United States Parole Commission to revoke the petitioner's parole.  The petitioner is represented by counsel.

      On November 18, 2004, the petitioner was granted permission to proceed as a pauper.  On that same date, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate.  Therefore, the respondents were directed to show cause why the petition should not be granted.  After being granted an extension of time to respond, the respondents filed a response to the petition on January 26, 2005.  The petitioner filed his reply on February 28, 2005, prompting the respondents to file a surreply on March 23, 2005.

      On August 18, 2006, the undersigned conducted a review of the file and determined that

additional information was necessary to resolve the issues raised in the petition. Thus, the undersigned directed the respondents to file copies of the tapes or transcripts, whichever was available, of each of the petitioner's parole revocation proceedings. On September 18, 2006, the Court received a probable cause hearing digest dated September 6, 2002, and three tapes from the United States Parole Commission. The tapes include recordings of the petitioner's first parole revocation hearing held on May 5, 2003, his second parole revocation hearing held on June 2, 2003, and his third parole revocation hearing held on July 21, 2003.

**Petitoner's Factual Outline and Contentions**

    **1)    Petition**

The petitioner asserts that on August 16, 2002, he was walking on Martin Luther King, Jr. Avenue in Washington, D.C., at approximately 11:30 p.m., when a woman walking in front of him turned and attacked him. More specifically, the petitioner asserts that the woman swung at him and then wrestled him to the ground. During the ensuing altercation, the woman dropped her cell phone. The petitioner asserts that he was eventually able to extricate himself. After the parties separated, the petitioner asserts that the woman's friend, a man named "Uncle Pete," arrived. The petitioner asserts that he picked the woman's cell phone up off the ground and gave it to Uncle Pete. The petitioner asserts that he stayed on the scene for a few minutes trying to calm things down. At the time of the incident, the petitioner asserts that he had been on parole for three months, was actively looking for a job, and was on his way to visit his brother. As a result of the above described incident, the United States Parole Commission ("Commission") issued a violator warrant.

Petitioner admits that on July 26, 1983, he was sentenced by the Superior Court for the District of Columbia to six to eighteen years for rape while armed, two to six years for robbery, and three to ten years for assault with intent to commit rape, all sentences to run consecutively. On

November 1, 1993, the petitioner was paroled to a Maryland detainer for a robbery and kidnapping charge. In the spring of 2002, the petitioner was paroled on the Maryland charge and his parole supervision was transferred to Washington, D.C.

The petitioner asserts that after his release on parole, he made a concerted effort to improve his life. The petitioner asserts that with the support of his brothers and his godfather, he completed numerous job applications. Moreover, during his three months of freedom, the petitioner asserts that he uniformly complied with the conditions of his parole and followed the instructions of his parole officer, Paula Lawson.

After the incident on August 16, 2002, the petitioner was arrested and charged by the District of Columbia Metropolitan Police with one count of robbery and one count of threats. Those charges were later dismissed for want of prosecution because the complainant did not appear.

On September 4, 2002, the Commission held a probable cause hearing in the petitioner's case. At the hearing, the Commission found probable cause on a technical parole violation and on the criminal charges of robbery and assault. The Commission ordered that the petitioner be detained until resolution of the parole revocation matter. The hearing examiner, and later the Commission, agreed to subpoena Detective Vincent Tucci, Lieutenant Robert Conte, Mona Davis and James Chapman for the revocation hearing.

Next, the petitioner describes the events surrounding his parole revocation proceedings. After taking testimony from various witnesses, two hearing examiners determined that no violation occurred and recommended that the Commission make a no finding.[1] However, the petitioner asserts that the Commission completely ignored the factual findings of its own hearing examiners and found

---

[1] The petitioner explains that a "no finding" recommendation is the parole equivalent of a not guilty verdict. See Petition at 7, n.3.

that the petitioner had assaulted the woman.

**2) Contentions**

The petitioner asserts that his parole revocation proceedings violated his constitutional right to due process in four ways:

(1) because the Commission based its decision in part on the woman's hearsay testimony without good cause for her absence in violation of the confrontation clause;

(2) by reversing three credibility determinations made by its hearing examiners without being present for the live testimony;

(3) because the evidence was insufficient to disprove his claim of self-defense; and

(4) by enhancing his sentence eight-fold without sufficient rationale.

**Parol Commission Proceedings:**

(A) <u>The First Revocation Hearing</u>

At the petitioner's first revocation hearing held on May 5, 2003, the only witnesses who appeared were Paula Lawson, the petitioner's probation officer, James Chapman, a witness to the incident, David McCallum and the petitioner.

At this hearing, the petitioner denied the charges against him and asserted that his only involvement in the incident was defending himself. The petitioner explained to the examiner that Ms. Davis (the alleged victim) told the police that she (Davis) felt the petitioner "shadowing" her and that she swung on him before he could do anything to her. Petitioners' counsel also asserted that the petitioner's actions at the time were not indicative of or consistent with an assault or robbery. Counsel explained that instead of running away, the petitioner stayed around afterwards and tried to explain that it was all a misunderstanding. Moreover, counsel explained that the petitioner and Ms. Davis were on a well-lit street and that the petitioner was carrying a heavy backpack filled with

4

noodles.  Finally, counsel explained that the petitioner did not take Ms. Davis' cell phone, but rather, that she dropped it when she swung at him and that the petitioner promptly picked it up and gave it to her when asked.

Mr. Chapman  testified that he is an old friend of Ms. Davis and that she refers to him as "Uncle Pete."  Mr. Chapman explained that when he saw Ms. Davis she did not look as if she had been in a scuffle because her white shirt was not dirty, nor did she have any bruises or injuries.  Mr. Chapman also testified that he did not understand why Ms. Davis wanted to call the police.  Mr. Chapman testified that in his opinion, he did not think there was a robbery and that he did not see an altercation.  The hearing examiner found Mr. Chapman's testimony to be credible.

Also at the first revocation hearing, the petitioner's brother, David McCallum, testified that he was helping the petitioner in his efforts to secure employment.  Moreover, David McCallum testified that the petitioner was on his way to his house that night to deliver some noodles.

After the testimony, the hearing examiner made a recommendation of no finding on the technical violation, but to continue the other charges for the appearance of adverse witnesses.  The Commission agreed with the recommendation of the hearing examiner and scheduled a second revocation hearing for June 5, 2003.

(B) The Second Revocation Hearing

For the petitioner's second revocation hearing, the police officers and Ms. Davis, were subpoenaed.  Ms. Davis did not appear.  The hearing examiner did not make a finding of good cause for her absence.   The police officers, Det. Tucci and Lt. Conte, did appear and testify.

Det. Tucci testified that Ms. Davis had been wearing a security guard uniform on the night in question.  That uniform consisted of black pants and a white shirt with a gold stripe and a badge patch.   Det. Tucci then testified that he and Lt. Conte questioned Ms. Davis about the incident.

According to the detective, Ms. Davis asserted that the petitioner had been following her and that she felt threatened and that she swung at the petitioner when she felt his shadow on her. Ms. Davis told Det. Tucci that the petitioner grabbed her neck, threatened her, wrestled her down to the ground and took her cell phone. Det. Tucci testified that Ms. Davis appeared highly agitated and upset and that her shirt appeared mussed. The detective also testified that when he arrived, Ms. Davis had her cell phone in her hand. Det. Tucci further testified that Ms. Davis did not appear to be injured. Finally, Det. Tucci testified that he recalled the petitioner asking to press charges against Ms. Davis for attacking him.

Lt. Conte testified that he was involved in stopping the petitioner. Lt. Conte testified that by the time the police arrived, the petitioner was calmly walking down a street a couple of blocks away. Moreover, Lt. Conte testified that the petitioner saw him drive by on his way to the scene, but did not run. Additionally, when the petitioner was arrested, Lt. Conte testified that the petitioner appeared to not understand why he was being arrested.

The petitioner also testified at this hearing. The petitioner asserted that he was just walking down the street minding his own business when a woman in front of him, whom he had not even noticed, attacked him. The petitioner testified that she swung at him with a silver and black object which he later learned was her cell phone. The petitioner physically demonstrated how Ms. Davis had attacked him and testified that he was just trying to control the situation and defend himself when she wrestled him to the ground. The petitioner testified that he never swung at Ms. Davis.

The petitioner also testified that after the altercation, Ms. Davis jumped up and ran into the street to flag down Uncle Pete who happened to be passing by. Uncle Pete came over and asked the petitioner for the cell phone and the petitioner picked it up and gave it to him. The petitioner testified that he tried to explain to Uncle Pete what had happened. The petitioner also testified that he had

been incarcerated for the last 20 years and had no idea how to use a cell phone and had no reason to take one. Further, the petitioner testified that he was being supported financially by his family and that he had no reason to rob anyone.

The petitioner's counsel also played or read portions of the 911 call made by Ms. Davis. In the tapes, counsel asserted that the petitioner can be heard in the background trying to calm the situation down and apologizing for any misunderstanding. In addition, counsel read portions of the 911 tape in which Ms. Davis can be heard saying **"you damn right [I attacked you] cause you were all on my heels I knew that you were trying to do something, I did swing on you because I wasn't even going out like that."** <u>See</u> Petition at 9.

At the conclusion of the hearing, the petitioner asserted that the Commission could not use the hearsay testimony of Ms. Davis through the testimony of the police officers because to do so violated his right to confront and cross-examine all adverse witnesses. The hearing examiner found that both officers had agreed that Ms. Davis was the aggressor. He further found that without Ms. Davis' testimony there was insufficient evidence on the assault and robbery charge to justify revocation of parole. Therefore, the examiner recommended a "no finding" on both charges, reinstatement to parole, and release from custody.

(C) Review Process

The petitioner's case was then forwarded to the Commission's headquarters to begin a review process. During this process, a second examiner reviews the evidence to determine whether he agrees with the hearing examiner's recommendation. Here, the administrative reviewer was Henry Grinner. Upon his review of the evidence presented, Mr. Grinner agreed with the recommendation of the hearing examiner.

Petitioner's case was then re-reviewed by, Steve Husk, an executive hearing examiner. Mr.

Husk agreed that the evidence presented was insufficient to find that the petitioner had committed either charge.[2]  However, Mr. Husk found that the seriousness of the charges mandated that an additional continuance be allowed to secure the presence of Ms. Davis.  Mr. Husk stated that the Commission knew from the United States Attorney's Office that Ms. Davis was uncooperative and that personal service of the subpoena may be required.  Therefore, although not questioning the factual findings of the first two hearing examiners, Mr. Husk recommended that the petitioner's hearing be continued to a third revocation proceeding after personal service was attempted on Ms. Davis.

The Commission agreed with Mr. Husk's determination that there was insufficient evidence to make a finding that the petitioner had committed either a robbery or assault and ordered a third hearing for Ms. Davis' appearance.  Later, the Commission sent the petitioner's attorney correspondence in which the Commission stated that it had identified an additional adverse witness, Michael Baylor, and that Mr. Baylor would also be subpoenaed to testify at the third revocation proceeding.

(D) The Third Revocation Hearing

On July 24, 2003, the Commission held the petitioner's third revocation hearing.  Ms. Davis failed to appear.   The two police officers again appeared as did a new witness, Michael Baylor.  Petitioner objected to the third revocation hearing.

The hearing examiner again took the testimony of Det. Tucci and Lt. Conte.  In addition, Mr.

---

[2]Later in this Opinion/Report and Recommendation the undersigned finds that this re-review was outside of the parameters of the Commissioner's own published procedures.  Even though the review was outside of those procedures, Mr. Husk recognized the evidence at the revocation hearing was inadequate on which to find that Petitioner (McCallum) had committed the assault and robbery alleged as the basis for revocation.  Otherwise, there would have been no need for Mr. Husk to recommend another hearing.

Baylor testified as to what he witnessed that night.  The hearing examiner found Mr. Baylor's testimony so lacking in credibility that the testimony was discounted in its entirety.[3]  Mr. Baylor testified that he heard a scream and came around to where he saw an altercation in progress.  Mr. Baylor testified that he left the scene to retrieve a baseball bat with which he threatened the petitioner.  Mr. Baylor also confirmed that the petitioner picked up Ms. Davis' cell phone and handed it to Uncle Pete.  However, Mr. Baylor did not stay and talk to the police.

After his testimony, the hearing examiner asked Mr. Baylor if he could explain why there were so many omissions and inconsistencies in his story.  Mr. Baylor could not do so.  When pressed by the hearing examiner, the petitioner asserts that Mr. Baylor stated that "this incident happened so long ago, I don't remember everything word for word."  Petition at 14.

Petitioner submitted the following from  911 call transcript reflecting Ms. Davis' account of the incident to the 911 operator:

Yeah, this is Ms. Davis.  He didn't even get to do it because I wrestled him down.

---

[3] The petitioner identifies the following examples to show the inconsistent nature of Mr. Baylor's testimony:

> (1) Mr. Baylor originally testified that he saw the petitioner and Ms. Davis involved in a tussle on the ground and that he merely questioned the two about what was going on and then called the police.  Upon questioning by petitioner's counsel,  Mr. Baylor later admitted that he also obtained a bat and threatened the petitioner with it.  Upon further questioning, he then stated that he did not threaten the petitioner with the bat.  Finally, Mr. Baylor again admitted that he did threaten the petitioner with the bat.
> (2) Mr. Baylor originally testified that the petitioner had Ms. Davis' cell phone and that Uncle Pete was attempting to get it back.  He later admitted that the petitioner picked the cell phone up off the ground and gave it to Uncle Pete when asked.
> (3) Mr. Baylor first testified that the petitioner only told him to "mind his own business."  Mr. Baylor later testified that the petitioner threatened him and used obscenities.
> (4) Mr. Baylor first testified that when he saw the petitioner and Ms. Davis they were standing up before he left to call the police and retrieve his bat.  Later he testified that the two were tussling on the ground when he left to call the police and retrieve his bat.

See Petition at 13.  The petitioner identifies numerous other examples, but for the sake of brevity, the Court has listed just a few of those examples.  Id. at12-14.

I wrestled him down.  I'm a security guard for one, he was walking behind me the whole time, right, and I knew something was wrong because he was just a little too f***ing close to me, and he was trying to come up behind me to catch me off guard and come up and grab me from behind.  But I turned around fast, and I swung at him, and I caught him off guard.

Petition at 14.

The transcript shows that petitioner apologizing  to Ms. Davis for any misunderstanding and Ms. Davis  saying "I don't want to hear no apology . . . you were on my heels, I knew you were trying to do something, I did swing on you because I wasn't even going out like that."  Petition at 15.

In addition,  petitioner offered the testimony of his godfather, Willie Cheeks, who testified the petitioner had been staying with him since his release on parole.  Mr. Cheeks further testified he had been assisting the petitioner in his employment search.  He also testified that the petitioner was being supported by his family and that he had no reason to rob anyone.

At the conclusion of the hearing, the third hearing examiner recommended a no finding on both charges and immediate reinstatement to parole.  In his written hearing summary, the third hearing examiner found the testimony of Mr. Chapman important because Mr. Chapman was a friend of Ms. Davis and his testimony corroborated that of the petitioner.   Moreover, the hearing examiner found that there was no excuse for Ms. Davis' failure to appear, especially in light of her employment in law enforcement.  The hearing examiner also considered the testimony of the police officers and noted that the petitioner's testimony had been consistent at each hearing and that he did not flee the scene.  Finally, the hearing examiner determined that Mr. Baylor's testimony was inadequate and unreliable.

(E)     Second Review

After the petitioner's third parole revocation hearing, the petitioner's  case then proceeded

to Commission headquarters for review by a second hearing examiner. Prior to review by the second examiner, Mr. Husk told the second examiner that the petitioner was a dangerous offender. Despite Mr. Husk's intervention, Mr. Grinner, the second hearing examiner, agreed with the first hearing examiner and recommended a "no finding" and reinstatement to parole. Furthermore, Commissioner Cranston J. Mitchell agreed with all of these recommendations, terminated the revocation process, and reinstated the petitioner to parole. Thereafter, Mr. Cranston's approval was crossed out and Mr. Husk performed his own re-review of the case.[4][5]

On re-review, Mr. Husk determined that the critical testimony in the case came from Mr. Baylor. Mr. Husk conceded that Mr. Baylor's testimony was inconsistent. However, he declined to find that Mr. Baylor's testimony was not credible. Mr. Husk supported this finding with his assertion that Mr. Baylor was not biased, that Mr. Baylor was consistent with regard to certain testimony about the petitioner having his hand or arm around Ms. Davis' neck, and that Mr. Baylor eventually admitted that he had a bat that night. Mr. Husk did not find that the factual determinations of the hearing officer were clearly erroneous.

Based on these findings, Mr. Husk concluded that Mr. Baylor believed the petitioner to be the aggressor and that Ms. Davis was in imminent harm. Petition at 18. However, Mr. Baylor never testified that the petitioner was the aggressor. (Mr. Baylor was not present at the outset of the altercation.) Mr. Husk also concluded that at the time Mr. Baylor saw the altercation, the petitioner

---

[4]Later in this Opinion/Report and Recommendation the undersigned finds that this re-review was outside of the parameters of the Commissioner's own published procedures.

[5]Respondent intentionally or unintentionally glosses over the fact that after each hearing was conducted by a hearing examiner and his findings were reviewed by a second hearing examiner, Mr. Husk, an executive hearing examiner, re-reviewed the work and conclusions of the prior two hearing examiners and in each instance changed the recommended decision they had to the commission.

was assaulting Ms. Davis and that the petitioner's actions were inconsistent with a claim of self-defense. Ultimately, Mr. Husk recommended a finding that the petitioner had assaulted Ms. Davis and that recommendation was accepted by Commissioner Mitchell.

Additionally, Mr. Husk reversed the hearing examiner's findings as to Ms. Davis' continued refusal to testify. Mr. Husk stated that Ms. Davis apparently told Det. Tucci at some point that her mother had been killed many years ago in an unrelated case to prevent her testimony. Det. Tucci relayed this information to a member of the Commission's staff, who in turn relayed the information to Mr. Husk. Mr. Husk then used this information as his basis for good cause to excuse Ms. Davis from testifying, even though he never spoke to Ms. Davis, nor anyone who had personally spoken with her about this information. Mr. Husk did not verify this information prior to using it as a basis for his finding of good cause. Mr. Husk further concluded that Mr. Baylor's testimony corroborated that of Ms. Davis' to the police, and therefore, her testimony to the police had an "indicia of reliability."

(F) <u>Decision</u>

On August 21, 2003, the Commission issued its Notice of Action. In the notice, the Commission decided there was insufficient evidence on the robbery charge, but found that the petitioner did commit assault. The reasons given for this finding were the testimony of Michael Baylor, Det. Tucci and Lt. Conte. The notice further explained that the under the Commission's guidelines, the petitioner's criminal history placed him in the "fair" category and that the penalty for an assault without injury was therefore 12-16 months. However, the Commission, citing that the petitioner was a more serious risk than his salient factor score suggested, departed from the guidelines and imposed a sanction of 120 months.

**<u>Respondent's Factual Outline and Contentions</u>**

**Factual Outline**

In response to the petition, the respondents assert that:

1)  August 16, 2002, the petitioner was arrested in the District of Columbia and charged with robbery by force and violence.  (Facts not disputed.)

2)  On August 20, 2002, the petitioner's Community Supervision Officer ("CSO") asked the Commission to issue a warrant based on the petitioner's arrest and because he had tested positive for opiates.  The CSO also reported that the petitioner had recently undergone a psychological assessment which found that he possessed a "significant level of psychopathy" and that given the petitioner's "extensive violent criminal history and poor psychological prognosis," he was a "significant risk to the community."  Response (dckt. 14) at unnumbered 4.  Also included with the CSO's warrant request was an arrest report written by the D.C. Metropolitan Police Department ("MPD") recounting the circumstances of the petitioner's arrest.  According to the complainant, Mona Davis, she noticed the petitioner following her when she was walking home from the Metro Station.  Ms. Davis stated that the petitioner came up from behind and startled her.  Ms. Davis told the police that she told the petitioner to stop following her so closely and that he accused her of trying to hit him.  The report then alleges that the petitioner grabbed Ms. Davis by her neck when she attempted to call the police with her cell phone and that the petitioner told her to give him the phone or he would snap her neck.  Ms. Davis reported that at that time, an unknown citizen intervened and threatened the petitioner, who returned the cell phone.  The police arrived shortly thereafter and the petitioner was arrested some distance away.  Ms. Davis and the concerned citizen came to the scene of the arrest and identified the petitioner as the alleged assailant.

3)  On August 21, 2002, the Commission issued a warrant for the petitioner's arrest.  The petitioner was arrested on September 4, 2002.  (Facts not disputed.)

4) On September 6, 2002, the petitioner received a probable cause hearing at the D.C. jail. Petitioner denied the charges against him. The hearing examiner found probable cause to hold the petitioner for a revocation hearing. The examiner approved a subpoena for adverse witnesses, including Mona Davis, and the MPD Officer's involved in the petitioner's arrest. (Facts not disputed.)

5) On May 5, 2003, the Commission conducted a revocation hearing. Of the witnesses subpoenaed, only James Chapman appeared. Mr. Chapman testified that he did not believe petitioner was attempting to rob Mona Davis. Petitioner's counsel also gave a sworn statement in support of the petitioner's claim that Ms. Davis had swung her arm at the petitioner prior to the struggle. The hearing examiner recommended a no finding on the charge of using illegal drugs, but continued the assault and robbery charges with a request that the adverse witnesses again be subpoenaed. The Commission accepted this recommendation on May 14, 2003. (Facts not disputed.)

6) On June 5, 2003, the Commission held a second revocation hearing at the D.C. jail. This time the two MPD officers appeared to give testimony. Ms. Davis did not appear. Over the objection of the petitioner's counsel, the examiner took further testimony. At the conclusion of the hearing, the examiner made a "no finding" on the robbery and assault charges and recommended the petitioner's immediate reinstatement to parole. (Facts not disputed.)

7) The Commission's Executive Hearing Examiner (Mr. Husk) disagreed with the hearing examiner's "no finding" and recommended that the Commission make another attempt to secure the testimony of Mona Davis. The Executive Hearing Examiner expressed that, in spite of Ms. Davis' history of non-cooperation, a special effort should be made to have her served because the petitioner appeared to be a "significant public safety risk." Response at unnumbered 6.

8) In light of this recommendation, the Commission issued an order denying release and continuing the case for another hearing. In addition, the Commission directed that Ms. Davis be personally

served her subpoena by a law enforcement officer.  Shortly thereafter, the Commission "discovered" the name of a person the Commission asserted was previously  unknown and who allegedly came to the aid of Ms. Davis and also issued a subpoena for that person.[6]

9)   At the third and final revocation hearing held on July 24, 2003, two MPD police officers appeared.  Michael Baylor, the "unknown citizen" also appeared.  The hearing examiner took the testimony of the police officers who offered much the same testimony as they did at the previous hearing.  The hearing examiner then took the testimony of Mr. Baylor.  The respondent concedes that upon cross-examination, Mr. Baylor changed the details of his account.  The respondents assert, however, that Mr. Baylor remained consistent with regard to one critical aspect of his testimony, that he had seen the petitioner on top of Mona Davis with his hand or arm around her neck.  The hearing examiner found that Ms. Davis' absence was not excused for good cause and recommended a "no finding" on the violations and reinstatement to supervision.  The hearing examiner found that the evidence showed that Ms. Davis overreacted when the petitioner was following her and that there was no clear evidence that the petitioner had assaulted and robbed her.

10)   The Executive Hearing Examiner (Mr. Husk) disagreed with the findings of the hearing examiner.  In a memorandum to the Commission, the Executive Hearing Examiner recommended a finding of good cause to excuse Mona Davis and recommended that the petitioner's parole be revoked on the assault and robbery charge.  On the issue of good cause, the Executive Hearing

---

[6] Upon a review of the petitioner's parole revocation tapes, it is clear that the Commission knew about Mr. Baylor as early as the second parole revocation hearing.  At that hearing, Detective Tucci clearly identifies Michael Baylor as a witness to the event.  In addition, Detective Baylor stated that Mr. Baylor had also testified in the petitioner's grand jury proceedings.  Therefore, the Commission did not "discover" the identity of Mr. Baylor at this time.  In actuality, the Commission had this information prior to the time of the petitioner's first parole revocation hearing, and in fact, was informed of Mr. Baylor's name during the petitioner's earlier parole revocation proceedings.

Examiner relied on information the Commission had received prior to the last hearing from one of the MPD officers. That officer told a Commission staff member that Ms. Davis did not want to appear because she was frightened. Apparently, the officer told the Commission that Ms. Davis' mother had been killed to forestall her testimony in an unrelated case. The Executive Hearing Examiner concluded that this information was a credible indication of Ms. Davis' fearful state of mind and that her fear of testifying gave the Commission good cause to excuse her. In addition, the Executive Hearing Examiner disagreed with the findings of the hearing examiner as to the credibility of Mr. Baylor. The Executive Hearing Examiner listened to the tapes of Mr. Baylor's testimony and found that Mr. Baylor never wavered on his contention that he had seen the petitioner with Ms. Davis face down on the ground with his hands around her neck. The Executive Hearing Examiner also concluded that Mr. Baylor had no bias against the petitioner or in favor of Ms. Davis and found this fact significant.

11) Upon review by the Commission, the findings of the Executive Hearing Examiner (Mr. Husk) were accepted.

12) On August 20, 2003, the Commission issued a Notice of Action revoking the petitioner's parole, forfeiting credit for all time on parole, and continuing the petitioner to a presumptive reparole date of August 16, 2012, after the service of 120 months. The Commission noted that the guideline range for the petitioner's offense was only 12-16 months, but then justified its significant upward departure because it found the petitioner to be a more serious risk than indicated by the guidelines.

**Contentions:**

Based on these facts, the respondents assert that the petition should be denied for the following reasons:

(1) Revoking parole without the testimony of Mona Davis was not a violation of the

petitioner's Constitutional rights because

> (a) an accused parole violator does not enjoy Sixth Amendment Confrontation Rights,
>
> (b) the Commission had good cause to proceed without testimony from Mona Davis,
>
> (c) even in the absence of good cause, the Commission had reliable evidence in the MPD arrest report to substitute for petitioner's confrontation rights;

(2) Due process does not require probable cause findings to be made by the hearing officer in all parole systems;

(3) The Commission did not violate due process when it reversed the hearing examiner's credibility finding on the record;

(4) There is no judicial review of the merits of a parole revocation decision;

(5) In a parole revocation hearing, it is the parolee's duty to show that he did not violate parole; and

(6) The Commission did not violate due process by departing from the guidelines based on petitioners' violent prior record.

## The Petitioner's Reply

In reply to the Respondents' Response, the petitioner asserts that the government is attempting to justify the unconstitutional contortions the Commission used to ignore evidence. In other words, the petitioner argues that the Commission violated the petitioner's confrontation rights by relying on the hearsay evidence of Mona Davis. The petitioner asserts that he had no opportunity to confront and cross-examine Ms. Davis with her own words on the 911 tape that seemingly contradicts the account of the incident she gave to police. The petitioner argues that he has the right in parole proceedings to confront and cross-examine adverse witnesses and that this right to confrontation is defined by the Supreme Court.

17

In the alternative, even assuming that he did not have an absolute right to confront and cross-examine adverse witnesses at his parole proceedings, the petitioner argues that the Commission has failed to show good cause for proceeding without the testimony of Ms. Davis. The petitioner asserts that the Commission did not pursue due diligence in securing the presence of Ms. Davis and that the Commission improperly relied on double and triple hearsay to find good cause. Moreover, even if the Commission may rely on such hearsay evidence to make a good cause determination, the petitioner argues that the reasons given cannot establish good cause. Additionally, even if the basis for Ms. Davis' absence is acceptable, the hearsay evidence used was not reliable and is not appropriate.

Next, the petitioner argues that the Commission violated his due process rights when it ignored the finding of no cause made by three different hearing examiners. The petitioner asserts that there is a difference between a mere recommendation and a specific factual finding. The petitioner concedes that the Commission may accept or reject the recommendation of the hearing examiner, but the petitioner asserts that the Commission may not simply set aside a factual finding.

Furthermore, the petitioner argues that the evidence produced before the Commission failed to satisfy the appropriate standard of proof. In this argument, the petitioner asserts that at a revocation hearing, the standard of proof is a preponderance of the evidence. However, in this case, the petitioner also presented evidence of self-defense. Therefore, the petitioner asserts that the Commission had to disprove the petitioner's theory of self-defense.

Finally, the petitioner asserts that the issues raised in the petition are suitable and appropriate for the Court's review. In support of this claim, the petitioner asserts that the Court's review of a parole decision is limited to claims that the Commission failed to follow the Constitution and/or statutory and regulatory provisions. The petitioner asserts that he has shown that the Commission

violated his Constitutional due process and confrontation rights and has violated its own regulatory provisions. The petitioner asserts that he is not asking this Court to make credibility determinations among the witnesses, instead, the petitioner is merely asking the Court to prevent the Commission for violating due process.

**The Respondents' Surreply**

In the Surreply, the respondents assert that the petitioner continues to argue that parole revocations hearings are subject to the same Sixth Amendment right that applies to criminal trials. However, the respondents assert that this contention is plainly wrong. In addition, the respondents assert that the petitioner continues to request that the Court engage in a merits determination of the Commission's decision, which the Court clearly lacks the authority to do. The respondents also take issue with the petitioner's claim that the Commission did not exercise due diligence in seeking the testimony of Mona Davis and reargue several points made in their response.

After a review of the petitioner's parole tapes, the pleadings, and all other documentary evidence filed in this case, the undersigned makes the following findings and recommendations.

**II.**

**Analysis**

**A.  Right to Confrontation**

"[T]he revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." Morrissey v. Brewer, 408 U.S. 471, 480 (1972). "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." Id. With respect to the revocation hearing, "the parolee must have an opportunity to be heard and to show, if he can, that he did not violate the condition, or,

if he did, that circumstances in mitigation suggest that the violation does not warrant revocation. The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody." Id. at 488.

In Morrissey, the Supreme Court set forth the minimum requirements of due process which are due a person in a revocation proceeding. Those requirements include "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of the evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing such confrontation); (e) a neutral and detached hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons fo revoking parole." Id. at 489. Further, the Supreme Court emphasized that a parole revocation proceeding is not to be equated with a criminal prosecution. Id. Rather, parole revocation proceedings should be "flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in any adversary criminal trial." Id.

In Gagnon v. Scarpelli, 411 U.S. 778, 782 n. 2 (1972), the Supreme Court further noted that where the availability of a witness is at issue, Morrissey does not "prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence." Thus, it is clear that with respect to parole revocation proceedings, the Supreme Court has carefully "sought to preserve the flexible, informal nature of the revocation hearing, which does not require the full panoply of procedural safeguards associated with a criminal trial." Black v. Romano, 471 U.S. 606, 613 (1985).

Recently, the Supreme Court held in Crawford v. Washington, 541 U.S. 36 (2004), that a

criminal defendant in a criminal trial has an absolute right, under the Sixth Amendment, to confront and cross-examine an accusing witness who has given an out-of-court statement against him, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. This case abrogated the Supreme Court's previous ruling in Ohio v. Roberts, 448 U.S. 56 (1980), which allowed the admission into evidence of a statement given by a witness against a criminal defendant, if the witness is unavailable and the statement bears an adequate indicia of reliability.

It is undisputed that the Commission relied upon Ms. Davis' hearsay in revoking McCallum's parole.

Petitioner argues that in Morrissey, the Supreme Court found that each parolee is guaranteed the right to confront and cross-examine witnesses at a revocation hearing. Petitioner also argues that the Supreme Court has recently clarified the right of cross-examination in Crawford. In fact, the petitioner argues, the Supreme Court has found that testimonial hearsay found in police reports is exactly the type of hearsay evidence that the Supreme Court found unconstitutional in Crawford. Therefore, the petitioner asserts that his incarceration must be reversed because his right to confront adverse witnesses was violated.

Second, the petitioner asserts that even if Crawford does not apply to parole proceedings, the Commission failed to show that Ms. Davis' hearsay testimony should have been admitted. In support of this claim, the petitioner asserts that in Morrissey, the Supreme Court stated that the right to confront witnesses ensures that a violation is based upon reliable and verifiable facts. Petition at 21 (citing Morrissey, 408 U.S. at 484). The petitioner further notes that Morrissey recognized a two-fold problem with hearsay testimony: (1) "it prevents the parolee from confronting and cross examining the declarant;" and (2) "unreliable hearsay undermines the accuracy of the fact-finding process." Id. (quoting McBride v. Johnson, 118 F.3d 432, 438 (5th Cir. 1997)" Therefore, the

petitioner asserts that "whether the admission of hearsay evidence violates the parolee's right to confrontation, courts have said the analysis must balance the parolee's interest in his constitutional guaranteed right to confront against the Commission's good cause for denying that fundamental right." Id. at 21-22 (citing United States v. Comito, 177 F.3d 1166 (9th Cir. 1999); Zentgraf v. United States, 20 F.3d 906 (8th Cir. 2000)).

In order to appropriately balance the rights of the parolee to that of the Commission, the Ninth Circuit has held that two factors must be considered: (1) the importance of the hearsay evidence to the ultimate finding; and (2) the nature of the facts to be proven by the hearsay. Comito, 177 F.3d at 1171. With respect to the first factor, "the more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect a verified fact." Id. In other words, the more important the fact, the more important is the parolee's right to confrontation. With respect to the second factor, "the more questionable the accuracy and reliability of the proffered evidence, the greater the releasee's interest in testing it by exercising his right to confrontation." Id.

In this instance, the petitioner asserts that his strength of interest was similar to that of the parolee in Comito, and that his right to confrontation was equally violated.[7] Here, the petitioner

---

[7] Comito was charged with fraudulently using his girlfriend's bank cards, credit cards and checks without her permission. However, at his revocation hearing, Comito's girlfriend did not appear to testify. Instead, the Court allowed Comito's probation officer to explain that the girlfriend had told him that Comito had used the cards and checks without her permission. Comito, on the other hand, admitted to using the cards and checks, but testified that he did so with his girlfriend's permission. Comito's supervised release was revoked and he appealed alleging a violation of the confrontation clause. On appeal, the Ninth Circuit found that in calculating the weight of Comito's interest in confronting his girlfriend, both factors weighed strongly in favor of confrontation. The Court noted that the hearsay testimony directly contradicted Comito's version of events and that the hearsay testimony was critical in the ultimate finding. In addition, the Court noted that the girlfriend's accusations were unsworn verbal allegations, the "least reliable type of hearsay." Comito at 177 F.3d 1171. The Court then analyzed whether there was good cause for denying Comito's confrontation rights. In doing so, the prosecution claimed that Comito's girlfriend would not testify because she was afraid of him. However, the

asserts that what Ms. Davis told the police was crucial to the Commission's decision to revoke his parole. Furthermore, the petitioner asserts that the only evidence the Commission had against him was Ms. Davis' oral allegations to the police. Moreover, the petitioner argues that such statement was merely an unsworn verbal allegation, which has been recognized by the Supreme Court as the least reliable type of hearsay. In fact, the petitioner asserts that the only statement definitively made by Ms. Davis in her own words was that to the 911 operator. A review of the content of that 911 conversation clearly establishes that Davis told the operator she struck out at McCallum and that she wrestled the him to the ground. The statements in the 911 statement are in contradiction to verbal statements Davis made to the police. Thus, the nature of the facts to be proven -- how the altercation started and developed -- weighs heavily in favor of confrontation. How heavily the Commission relied on the facts (the weight the Commission gave to certain facts) in reaching the underlying decision is only known by the Parole Commission. This is particularly true when the Commission had other inculpatory evidence, including but not limited to the Baylor testimony.

The petitioner then asserts that the government has failed to offer adequate evidence of good cause, so as to tip the scales in favor of the Commission. More specifically, the Commission relied on double and triple hearsay that Ms. Davis had some fear of being involved, based on something that happened to her mother years ago in an unrelated case. This, the petitioner argues, is not an expression of "extreme fear" as the Commission contended in finding good cause. Instead, the petitioner asserts that this evidence is akin to that in Comito and likewise, is insufficient to make a finding of good cause. The petitioner asserts that without any direct evidence that Ms. Davis was

government offered no further evidence and the Court found that there was nothing to tip the scale in the government's favor. Comito's revocation of supervised release was therefore reversed in light of the confrontation clause violation.

actually frightened, the Commission's finding of good cause does not outweigh the petitioner's right to confrontation.

In the alternative, the petitioner argues that the Eighth Circuit has followed a similar analysis which requires "the government demonstrate that the burden of producing live testimony would be inordinate and offer in its place hearsay evidence that is demonstrably reliable." Zentgraf, 20 F.3d at 909. In that case, the government's witness refused to testify because he was going to prison and did not want to be labeled a snitch. The Eighth Circuit found that this did not even come close to offering a sufficient explanation for the witness not testifying.

Moreover, as to whether the Commission may find good cause because there is an indicia of reliability to Ms. Davis' oral allegations, the petitioner argues otherwise. Specifically, the petitioner asserts that the key fact in this case was credibility, the credibility of the petitioner versus the credibility of Ms. Davis. Here, the petitioner argues, there was no way to judge the credibility of Ms. Davis' statements to the police since she did not testify. Additionally, the petitioner asserts that even if some of the ancillary details of Ms. Davis version of events were corroborated by other testimony, confrontation is still required because the key issue is contested.

Finally, the petitioner asserts that the testimony of Michael Baylor cannot be used to form the basis for reliability of the police report and override the petitioner's constitutional rights. In support of this claim, the petitioner asserts that aside from the many inconsistencies in Mr. Baylor's testimony, his clear bias, coupled with his flight from the scene, renders his testimony useless. Moreover, the petitioner argues that Mr. Baylor could not testify to the key fact, who was the aggressor, and whether or not the petitioner was merely defending himself.

In response to this claim, the respondents assert Sixth Amendment confrontation rights apply in criminal trials, not parole revocation proceedings, and therefore, the petitioner's right to cross-

examination is not defined in conformity with <u>Crawford</u>. Moreover, the respondents assert that there is nothing in <u>Crawford</u> to suggest that the Supreme Court intended to overrule any part of <u>Morrissey</u> or <u>Gagnon</u>. The respondents further assert that the term confrontation cannot be defined the same in all contexts, and under <u>Morrissey</u> and <u>Gagnon</u>, the best a parolee can expect is a limited right of confrontation.

Next, the respondents assert that the Commission had good cause to proceed without the testimony of Mona Davis. The respondents assert that under <u>Morrissey</u>, a parolee has a right to confrontation and cross-examination, unless the hearing officer finds good cause for not allowing confrontation. The respondent asserts that none of the cases cited by the petitioner are applicable in this case because none of those cases involve an adverse witness who simply refuses to testify despite repeated subpoenas. However, the respondents further argue that even if Ms. Davis' reported fear of testifying was not sufficient to justify her failure to appear, the Commission was not obligated to dismiss its case against the petitioner. Moreover, although the Commission could have sought the enforcement of its subpoena from a United States District Court, Ms. Davis's refusal to appear would have only been punishable by contempt. The respondents assert that the Commission made diligent efforts and did everything within its power to acquire the appearance of Ms. Davis. Thus, the respondents assert that the Commission should not be punished for Ms. Davis' failure to appear and permitting the petitioner's parole revocation to proceed without the presence of Ms. Davis was not a violation of due process.[8]

---

[8] Based on a thorough review of the petition, the undersigned does not believe that the petitioner has raised this particular due process issue. Although petitioner's counsel objected to the use of Ms. Davis' hearsay testimony, it was never argued that the proceeding itself could not continue. Rather, it was only argued that the disputed evidence should not be considered in any parole revocation decision. Therefore, because the undersigned is of the opinion that this particular due process argument has not been raised by the petitioner, it has not been addressed with more detail in this Opinion.

Third, the respondents assert that there is an objective basis in the record for the Commission's finding of good cause. The respondents assert that apart from her refusals to appear, the Commission found good cause based on Ms. Davis' reported expressions of fear. The respondents argue that this position is supported by <u>Morrissey</u> in which the Supreme Court stated "if the hearing officer determines that [an] informant would be subjected to risk of harm if his identity was disclosed, he need not be subjected to confrontation and cross-examination." Response at unnumbered 14 (citing <u>Morrissey</u>, 408 U.S. at 487).[9] The respondents assert that such fear was even more appropriate in this case in light of the petitioner's violent record. The respondents further assert that under any objective analysis, it cannot be disputed that Ms. Davis was exposed to an increased risk of violence because she would have been testifying against a parolee with a violent record.[10] Thus, her reported state of fear was reasonable. Moreover, the respondents assert that the Commission did not have to prove that Ms. Davis would actually be harmed, only that her expression of fear was not unreasonable.

Fourth, the respondents assert that even in the absence of good cause, the Commission had reliable evidence in the MPD arrest report to substitute for petitioner's confrontation rights. In support of this contention, the respondents assert that "[i]t is well-established that, when a requested adverse witness fails to appear without good cause at a parole, probation, or supervised release revocation hearing, and revocation has been based on documentary evidence, the courts will uphold

---

[9] The undersigned, however, is not certain how this passage in <u>Morrissey</u> supports the respondents' argument. That passage clearly contemplates a confidential informant, who, if identified, would be placed in peril. In this case, however, the petitioner already knew Ms. Davis' identity. The two sets of facts are simply not analogous.

[10] That fact would be true of most witnesses. Therefore, without more, the fact that petitioner had a violent criminal record does nothing to bolster Ms. Davis' alleged fear.

the revocation provided the evidence had 'sufficient indicia of reliability.'" Response at unnumbered 16 (citing <u>United States v. McCallum</u>, 677 F.2d 1024, 1026 (4th Cir.) <u>cert.</u> <u>denied</u>, 459 U.S. 1010 (1982)).  With regard to the use of police reports in revocation proceedings, the respondents assert that a police report has an adequate of indicia of reliability when the "report is 'quite detailed,' the police observed physical evidence that an assault had taken place, and the witnesses have identified the parolee as the assailant."  Response at unnumbered 17 (citing <u>Crawford v. Jackson</u>, 323 F.3d 123 (D.C. Cir. 2003)).  Adding to that reliability is the admission of key facts by the parolee while only offering a far-fetched explanation in defense to the alleged violations.  <u>Id.</u>

The respondents assert that the situation in this case is much the same as that in <u>Crawford v. Jackson</u>.  The respondents assert that the Commission had the MPD report, which the respondents assert is very detailed, and the eyewitness identification by Mona Davis and Michael Baylor.  Moreover, the respondents argue that the petitioner admitted key facts and that Mr. Baylor testified to seeing the petitioner assault Ms. Davis.  In addition, the respondents note that other courts have held that a police report may be considered reliable if it is corroborated by collateral sources or contains a highly detailed description of the event.  Response at unnumbered 18 (citing <u>Downie v. Klincar</u>, 759 F.Supp. 425, 429 (N.D. Ill. 1991)).  In this case, the respondents assert that the petitioner's explanation, that Ms. Davis attacked him and that he was only defending himself, "is to say the least . . . far-fetched."  <u>Id.</u> at 17.  Therefore, the respondents assert that the Court should conclude that the circumstances show that the hearsay evidence relied on by the Commission was not so lacking in support that it was fundamentally unfair.  <u>Id.</u>

**1. Application of <u>Crawford v. Washington</u> to parole proceedings**

It is quite clear the Supreme Court's decision in <u>Crawford v. Washington</u>, is applicable to criminal defendants in criminal trials.  Not so clear, is the application of that case to parole revocation

proceedings.[11]  However, there is nothing in <u>Crawford</u> to suggest that the Supreme Court intended

that decision to apply to parole revocation proceedings, or that its decision would in anyway abrogate

the findings in <u>Morrissey</u> or <u>Gagnon</u>.  In the absence of such clear intent as binding precedent, the

undersigned concludes that <u>Crawford</u> is not applicable to parolee revocation proceedings for the

following reasons:

i.  In <u>Morrissey</u>, the Supreme Court recognized only a limited right to confront and cross-
    examine adverse witnesses.

ii.  Moreover, the Court noted that parole revocation proceedings should not be equated with
     criminal trials.

iii.  The absolute Sixth Amendment right to confront and cross-examine that was recently
      recognized in <u>Crawford</u>, simply cannot be reconciled with the limited rights of a parolee in
      a parole revocation proceeding.[12] [13]

      To the extent that the petitioner merely argues that <u>Crawford</u> defines the right to

---

[11] <u>See</u> <u>United States v. Martin</u>, 382 F.3d 840, 844 n. 4 (8th Cir. 2004) (<u>Crawford</u> not applicable to supervised release); <u>United States v. Aspinall</u>, 389 F.3d 332 (2d Cir. 2004) (same); <u>United States v. Barraza</u>, 318 F.Supp.2d. 1031 (S.D.Cal.) 2004) (same); *compare*, <u>United States v. Jarvis</u>, 2004 WL 603466 (9th Cir. 2004) (right of confrontation as defined in <u>Crawford</u> applies to parolee revocation hearings); <u>Ash v. Reilly</u>, 2004 WL 2800937 (D.D.C. 2004) (Ash I) and <u>Ash v. Reilly</u>, 2005 WL 226242 (D.D.C. 2005) (Ash II) (relying on the definition of confrontation as outlined in <u>Crawford</u> to define the right to confrontation in parolee proceedings).

[12] If <u>Crawford</u> was applicable to parole revocation proceedings, the proceedings in this case would have clearly violated the petitioner's right to confrontation.  However, the respondents argue that even if <u>Crawford</u> were applicable, it is not retroactive and cannot be applied in petitioner's case.  The petitioner argues that retroactivity is not a concern because this petition is not collateral litigation and no <u>Teague v. Lane</u>, 489 U.S. 288 (1989), problem exists.

[13] Because the undersigned finds that <u>Crawford</u> is not applicable to parole revocation proceedings, I have not addressed the parties claims as to retroactivity.  I do note, however, that the Supreme Court has recently found that <u>Crawford</u> is not retroactive to cases on collateral review.  <u>See</u> <u>Whorton v. Bockting</u>, ___ U.S. ___, 127 S.Ct. 1173 (2007).

confrontation recognized in <u>Morrissey</u>, that argument is untenable for the same reasons. The right in <u>Crawford</u> is an absolute Sixth Amendment right. The right recognized in <u>Morrissey</u> is merely a limited due process right. Thus, while <u>Crawford</u> may be somewhat instructive in parole revocation proceedings with regard to the general nature and reliability of police reports, it does not define the right of confrontation recognized in <u>Morrissey</u>.

**Application of <u>Morrissey v. Brewer</u> to parole proceedings**

That being said, the undersigned turns to whether the petitioner's right to confrontation under <u>Morrissey</u> in the parole revocation process was violated. In a parole revocation proceeding, there is only a limited right to confrontation. That right is limited by a finding of good cause. Of the Courts to address whether there is good cause for not allowing confrontation, they have formulated balancing tests, pitting the right of the parolee against the reasons for not testifying. Moreover, those inquiries appear to be based on the circumstances of each individual case. Thus, the Court will address the reasons for Ms. Davis not appearing and the reasons for requiring confrontation.

**Balancing Test**

Under the Ninth Circuit's balancing test, the Court must first determine the importance of the hearsay to the ultimate finding. <u>See</u> <u>Comito</u>, <u>supra</u>. In this case, the hearsay testimony of Mona Davis was a significant factor in the Commission's decision. In its notice of action, the Commission clearly states that it relied on the police report and testimony of the police officers in making its determination. <u>See</u> Exhibits in Support of Response to Petition (dckt. 14) (hereinafter "Exhibits") at Ex. Q.

The Court must then consider the nature of the facts to be proven by hearsay. In this case, the hearsay testimony goes directly to the heart of the facts to be proven at the revocation hearing. The hearsay testimony of Mona Davis was the only testimony the Commission had regarding Ms.

Davis' version of the events and the only testimony, other than the petitioner's, to show how the altercation started and what transpired during that altercation.

Moreover, there is a significant question as to the reliability of that evidence. In the police report, Ms. Davis told the police officers that the petitioner wrestled her to ground, took her cell phone, and assaulted her. However, to the 911 operator, Ms. Davis states that she swung at the petitioner first and then wrestled him to the ground. This information, in Ms. Davis' own words, directly contradicts the information she relayed to the police officers. In addition, the witness testimony at the parole revocation hearing clearly established that Ms. Davis dropped her cell phone when she swung at the petitioner. The petitioner did not take the phone, it was dropped on the ground. Moreover, when requested, the petitioner picked the phone up off the ground and gave it to Uncle Pete. The petitioner's interest in confrontation in this case was significant and the facts weigh heavily in favor of confrontation.

However, the Court must now balance the petitioner's significant interest in confrontation against the Commission's reasons for not allowing confrontation. In this case, the Commission was informed by third parties that Ms. Davis was afraid of testifying. This fear was allegedly based on the fact that Ms. Davis' mother was killed many years to forego her testimony in an unrelated case. The Commission asserts that this information constituted an expression of extreme fear on the part of Ms. Davis that was adequate to find good cause for her absence.

There is no evidence in this case that Ms. Davis had any reasonable fear of testifying against the petitioner at his parole revocation hearing. What may or may not have happened to Ms. Davis' mother many years ago may be indicative of a general fear of testifying in criminal matters, but provides no basis for any fear of testifying against the petitioner at his parole revocation hearing. It has not even been established that any such fear actually existed. There was no verification that

this incident ever happened, how many years ago it allegedly occurred, or how that incident/fear colored Ms. Davis' perceptions about testifying against the petitioner. In fact, the information relied on by the Commission did not even come directly from Ms. Davis, but from third parties. No one at the Commission actually spoke to Ms. Davis to confirm her fear or to determine whether her fear, if any, was reasonable. The undersigned concludes that this absence of evidence establishing Davis' actual fear of testifying against petitioner undermines the Commissions' rationale for excusing her absence. Under such circumstances, petitioner's significant interest in confrontation clearly outweighs the Commission's stated interest in not allowing confrontation.[14]

Likewise, reviewing the facts of this case under the balancing test of the Eighth Circuit, see Zentgraf, supra, the petitioner's interest in confrontation clearly outweighs those of the Commission. Under the Eighth Circuit's test, the government must prove that the burden of producing live testimony would be inordinate and offer in its place hearsay evidence that is demonstrably reliable. Here, it appears that the Commission did all it could to produce the live testimony of Ms. Davis. Ms. Davis was subpoenaed no less than three times, with the third time being personal service by a law enforcement official. To the extent that the petitioner asserts that the Commission should have filed charges in the District Court, the undersigned is not persuaded by this argument. Even had the Commission sought such relief, Ms. Davis would not have been compelled to appear, she merely would have been cited for contempt. See 18 U.S.C. § 4214(a)(2) (1976). The Commission simply

---

[14] To the extent that the respondent argues that the petitioner's extensive criminal history is sufficient to establish a reasonable fear of testifying, it does not appear that the petitioner's criminal history is even relevant in this inquiry. There is no evidence that Ms. Davis was aware of the petitioner's criminal history of violence against women or that it colored Ms. Davis' decision to not testify in this case. The Commission's finding of "extreme fear" was based on an incident that happened to Ms. Davis' mother many years ago in an unrelated case. There is no evidence to suggest that Ms. Davis had any fear of the petitioner, only a general fear of testifying. Thus, it does not appear that the petitioner's violent criminal history had anything to do with Ms. Davis' decision to not testify or that her knowing, or not knowing, of the petitioner's criminal history would have made any difference.

had no other means by which to compel Ms. Davis to appear and cannot be faulted for her failure.

However, the government must also show that the hearsay evidence offered in place of the live testimony of Ms. Davis was demonstrably reliable. Hearsay evidence may be demonstrably reliable when it has a "sufficient indicia of reliability." United States v. McCallum, 677 F.2d at 1026. Moreover, as noted by the respondents in their response, police reports used in revocation proceedings have an adequate indicia of reliability when the "report is 'quite detailed,' the police observed physical evidence that an assault had taken place, and the witnesses have identified the parolee as the assailant." See Crawford v.Jackson, supra. Adding to that reliability is the admission of key facts by the parolee while only offering a far-fetched explanation in defense to the alleged violations. Id. See also Downie v. Klincar, 759 F.Supp. 425, 429 (N.D. Ill. 1991) (police report may be considered if it is corroborated by collateral sources or contains a highly detailed description of the violations).

Here, there were witnesses who identified the petitioner as the assailant. Moreover, the police report is somewhat detailed.[15] However, the police officer's summation of Ms. Davis' version of the

---

[15] The report states that the MPD responded to a call for an assault in progress in the 2000 block of Martin Luther King Avenue. See Response at Ex. F. The report also states that upon arrival, the officers were told that the assailant was headed east bound on U St. SE. Id. The report also states that the defendant was stopped in the 2000 block of 13th Street. Id. The report states that Ms. Davis was walking on Martin Luther King Avenue when she noticed the petitioner walking on the opposite side of the street. Id. The petitioner crossed the street and began walking behind her. Ms. Davis told the police that the petitioner came behind her and startled her. Id. Ms. Davis stated that a brief discussion took place and that the petitioner accused Ms. Davis of trying to hit him. Id. Ms. Davis allegedly told the petitioner to stop walking so close to her and that she apologized for any misunderstanding. Id. Ms. Davis told the police that the petitioner then grabbed her from behind and placed her in a choke hold. Id. Ms. Davis told the police that when she tried to call the police with her cell phone, the petitioner allegedly said that he would snap her neck. Id. At this point, Ms. Davis stated that an unknown citizen came to her aid. Id. The petitioner allegedly told the unknown citizen that it was none of his business and threatened to snap Ms. Davis' neck again. Id. Ms. Davis told the police that Uncle Pete arrived at this time and got her phone back from the petitioner. Id. The report then states that Ms. Davis and one of the witnesses identified the plaintiff and that he was placed under arrest and transported to the Seventh District for processing. Id.

events in the police report are directly contradicted by Ms. Davis' own words on the 911 tape. Additionally, the police did not observe any physical evidence that an assault had taken place.[16] Significantly, the petitioner never admitted any key facts. Although the petitioner admitted that he was walking behind Ms. Davis and that an altercation occurred, those are not the key facts of this case. Rather, the key facts of the case center on how the altercation started and who was the aggressor. With regard to those issues, the petitioner has consistently maintained that Ms. Davis was the aggressor, that she swung at him, that she wrestled him to the ground and that he was merely defending himself. Moreover, the respondents' assessment of the petitioner's defense is off as well. Ms. Davis admitted on the 911 tape that she swung at the petitioner and that she wrestled him to the ground. The petitioner's defense that his involvement in the altercation was merely in self-defense is not far-fetched given the circumstances. Even assuming that Mr. Baylor saw the petitioner with his arm around Ms. Davis neck, such testimony is in line with the petitioner's assertion that he was merely trying to gain control of Ms. Davis and the circumstances and defend himself. Mr. Baylor's testimony simply does not corroborate Ms. Davis description of the events in the police report. Mr. Baylor did not see how the altercation occurred, nor, as the respondent suggests, did Mr. Baylor ever testify that he believed that the petitioner was the aggressor.

---

However, the undersigned notes that many of the undisputed details of the event are missing form this report. Some of those facts include, the state of Ms. Davis clothes, the lack of injuries, the petitioner not knowing why he was being arrested and the petitioner asserting that Ms. Davis had attacked him. All of these details are relevant to a finding of assault. Moreover, the names of the witnesses are missing and some of the facts appear to be wrong. It has not been disputed that the petitioner did not take Ms. Davis' cell phone, but that she dropped it during the struggle. Moreover, it is not disputed that the petitioner did not have possession of the phone at the time he handed it to Uncle Pete. Instead, it is undisputed that the petitioner picked the phone up off the ground where it fell and then handed the phone to Uncle Pete.

[16] At the revocation hearings, although the police officers testified that Ms. Davis' shirt was "mussed," they also testified that she was not injured. In addition, the police officers testified that Ms. Davis' white shirt was not dirty, even though Mr. Baylor testified that the petitioner had Ms. Davis face down on the ground.

Based on the foregoing analysis, the undersigned concludes that the Commission has not established that Davis' hearsay evidence had "sufficient indicia of reliability" to permit its use and consideration in lieu of confrontation. The undersigned also concludes that confrontation is warranted under the balancing test set forth by the Eighth Circuit.[17]

However, even if the petitioner's right to confrontation had not been violated, it appears that the Commission failed to follow its own regulations and procedures, giving the petitioner's parole revocation proceedings an appearance of impropriety that leads the Court to question the fairness and impartiality of those proceedings.

## B. Failure to Follow Commission's Own Rules and Regulations

Pursuant to 28 C.F.R. § 2.23(a), the Commission has delegated to the hearing examiners, "the authority to conduct hearings and to make recommendations relative to the grant or denial of parole or reparole, revocation, or reinstatement of parole." Moreover, "[a] panel recommendation is required in each case decided by a Regional Commissioner after the holding of a hearing." Id. at § 2.23(b). A panel recommendation consists of "**the concurrence of two hearing examiners**, or of a hearing examiner and the Executive Hearing Examiner." Id. "**In the event of divergent votes**, the case shall be referred to another hearing examiner . . . for another vote." Id. at § 2.23(c). "**If concurring votes do not result from such a referral**, the case shall be referred to any available hearing examiner until a panel recommendation is obtained." Id.

"Upon review of the examiner panel recommendation, **the Regional Commissioner may**

---

[17] See also Farrish v. Mississippi, 836 F.2d 969, 978 (5th Cir. 1988) (when the credibility of two witnesses is the material question for the factfinder, testimony through police officers deprives a parolee of the right to confrontation) White v. White, 925 F.2d 287, 291 (9th Cir. 1991) (parolee's right to confrontation violated when victim's statement to police relied on rather than live testimony); Taylor v. United States Parolee Commission, 734 F.2d 1152 (6th Cir. 1984) (reliance on summary of police report containing hearsay was insufficient basis for revocation of parolee).

**make the decision by concurring with the panel recommendation**. If the Regional Commissioner does not concur, the Regional Commissioner shall refer the case to another Commissioner and the decision shall be made on the concurring votes of two Commissioners." Id. at § 2.24(a) (emphasis added by the undersigned). Upon review of the panel recommendation, the Regional Commissioner may also:

(1) Designate the case for the original jurisdiction of the Commission pursuant to § 2.17, vote on the case, and then refer the case for another Commissioner for further review; or

(2) Remand the case for a rehearing, with the notice of action specifying the purpose of the rehearing."

Id. at § 2.24(b).

In this case, after the petitioner's second revocation hearing, the hearing examiner made a "no finding" on the charges and recommended the petitioner for immediate parolee. Exhibits at L. The reviewing examiner, Mr. Grinner, concurred with that opinion and the panel recommendation was made to Commissioner Mitchell. Id. However, rather than accept, reject, or remand the panel recommendation, the case was somehow referred to Mr. Husk. Mr. Husk reviewed the panel finding and agreed that there was insufficient evidence to revoke parole, but recommended that the case be continued so additional efforts could be made to produce the live testimony of Ms. Davis. Id. This recommendation was accepted by Commissioner Mitchell and a Notice of Action issued. Id. at M.

After the petitioner's third revocation hearing, the hearing examiner recommended a "no finding" on the charges and immediate reinstatement to parolee. Exhibits at O. It is not disputed that just prior to the review by a second examiner, that examiner received a letter or memorandum from Mr. Husk, in which he was informed that the petitioner was a violent offender. Despite this information, the reviewing examiner concurred with the opinion of the hearing examiner. Exhibits

at O.  At this point in the process two hearing examiners concurred that the evidence was insufficient for revocation and had recommended a "no finding."   It is further undisputed that this panel recommendation was sent to Commissioner Mitchell who accepted that opinion and directed reinstatement to parole. Under Commission procedural rules, that should have been the end of the process.   However, somehow that recommendation was crossed off and the case was again transferred to Mr. Husk for his review.   Mr. Husk disagreed with the two previous examiners and recommended that parole be revoked.  Exhibits at P.  Moreover, Mr. Husk recommended a sentence of 120 months (10 years), when the guideline range for the offense was only 12-16 months.  Id.

Here, the panel recommendation consisting of two concurring examiner opinions was overridden by a single executive hearing examiner who did not observe any of the witnesses testifying.   In addition, once the panel recommendation was concurred with by Commissioner Mitchell, he changed his mind at the insistence of executive hearing examiner Husk, and sent the changed recommendation to the Commission. If Commissioner Mitchell disagreed with the panel recommendation, the case should have been referred to another Commissioner.  However, that did not happen in this case.  Instead, it appears that Commissioner Mitchell actually accepted the second recommendation and ordered reinstatement.  Somehow, though, that decision was crossed out and the case ended up with Mr. Husk.   Such interference in the process by the executive hearing examiner is not contemplated nor sanctioned in the Commission's own rules.   Clearly, the Commission failed to follow it own rules and procedures.

Moreover, the actions of the Commission, and in particular, Mr. Husk, leave grave doubts as to the fundamental fairness of the petitioner's parole revocation proceedings.  For example,  Mr. Husk's involvement in this case cannot be explained or rationalized within the pertinent rules and regulations.  In addition,  Mr. Husk picked a small portion of testimony from one witness, whose

testimony was inconsistent, and used that information, to the exclusion of all other evidence and testimony, to revoke the petitioner's parolee. Finally, Mr. Husk's letter to the second hearing examiner about the petitioner's criminal history gives the appearance of impropriety. That letter suggests that the Mr. Husk was attempting to persuade the second hearing examiner to make a recommendation that the petitioner's parole be revoked, not on the facts of the case, but because Mr. Husk believed that the petitioner was a dangerous individual.

Accordingly, the undersigned finds that the petitioner's parole revocation proceedings, as a whole, were not fair and impartial. Moreover, the petitioner's proceedings were not conducted by a neutral and detached hearing body. Therefore, the undersigned finds that the petitioner's proceedings were fundamentally unfair and violated the petitioner's due process rights.

## C. Sufficiency of the Evidence

Judicial review of a decision by the Parolee Commission is limited. See Brown v. Lundgren, 528 F.2d 1054 (5th Cir. 1976); Billiteri v. United State Board of Parolee, 541 F.2d 938 (2d Cir. 1976). "So long as there are no violations of any required due process protections and Commission has acted within its authority, [the District Court] will not usurp the Commission's position as established in the statutory scheme enacted by Congress." Stroud v. United States Parolee Commission, 668 F.2d 843, 846 (5th Cir. 1982). The District Court may review an action of the Parolee Commission to determine whether the decision of the Commission is arbitrary and capricious or an abuse of discretion. Dye v. United States Parolee Commission, 558 F.2d 1376, 1378 (10th Cir. 1977). An action of the Commission is arbitrary and capricious, or an abuse of discretion, when it is irrational, based upon impermissible considerations, or when it fails to comply with the Commission's own rules and regulations. Zannino v. Arnold, 531 F.2d 687, 690-691 (3d Cir. 1976).

Given that the undersigned has already concluded that Petitioner's limited rights of

confrontation were violated by the Commission's: excusing the absence of Davis without any verification or justification and consideration and obvious reliance on hearsay testimony as to what Davis had told police as evidence of what she would have testified to had she been present at the hearing and given that the undersigned has also concluded that the Commission violated its own rules providing minimal procedural due process in parole proceedings, the undersigned sees no need to address the sufficiency of evidence to determine whether the revocation decision is arbitrary or capricious or constituted an abuse of discretion from an evidentiary standpoint. This is particularly true when the undersigned has already indicated he does not know what weight the Commission gave to the various pieces of evidence received during the multiple hearings in this case. That is more properly left to the Commission at a future hearing.

## III.

## __Recommendation__

For the reasons set forth in this Opinion, the undersigned recommends that the petitioner's § 2241 petition be **GRANTED IN PART** and that the decision of the parole commission revoking McCallum's parole be set aside and that the matter of revocation of parole be REMANDED to the parole commission for further proceedings consistent with this opinion / report and recommendation and the parole commission's own rules and regulations. Gambino v. Morris, 134 F3d 156 (3rd Cir. 1998); Zannino v. Arnold, 531 F.2d 687, 692 (3rd Cir. 1976); United States v. Jarvis, 94 Fed. Appx. 501 (9th Cir. 2004); Comito, *supra*; Zentgraf, *supra* and McBride v. Johnson, 118 F.3d 432 (5th Cir. 1997).

Within ten (10) days after being served with a copy of this Opinion/Report and Recommendation, any party may file with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections.

A copy of such objections shall also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

 DATED: July 27, 2007.


   /s *John S. Kaull*
   JOHN S. KAULL
   UNITED STATES MAGISTRATE JUDGE